HARRY W.R. CHAMBERLAIN II (SBN: 95780)
BUCHALTER, a Professional Corporation
500 Capitol Mall, Suite 1900
Sacramento, California 95814
Telephone: 916.945.5170
Email: hchamberlain@buchalter.com

CECILIA MILLER (SBN: 211111)
RYAN CAPLAN (SBN: 253037)
BUCHALTER, a Professional Corporation
655 West Broadway, Suite 1600
San Diego, California 92101
Telephone: 619.219.5335
Facsimile: 619.219.5344
Email: cmiller@buchalter.com
        rcaplan@buchalter.com

Attorneys for Plaintiff,
HERITAGE BANK OF COMMERCE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HERITAGE BANK OF COMMERCE, a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>ZURICH AMERICAN INSURANCE COMPANY, a New York corporation,<br><br>Defendant. | Case No. _____<br><br>**COMPLAINT for:**<br><br>**(1) BREACH OF CONTRACT;**<br>**(2) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (BAD FAITH);**<br>**(3) SPECIFIC PERFORMANCE; and**<br>**(4) DECLARATORY RELIEF**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff HERITAGE BANK OF COMMERCE ("Heritage" or "Plaintiff") alleges as follows:

## SUMMARY OF ACTION

1.      This is an insurance coverage dispute in which the defendant excess carrier has denied its coverage obligations in connection with claims for which Plaintiff's primary carrier acknowledged coverage and exhausted its policy limits. Plaintiff brings the instant action to obtain

judicial declarations of coverage and to recover damages incurred as a proximate result of the insurer's bad faith breaches of its coverage obligations.

## THE PARTIES

2.      Plaintiff Heritage is a corporation organized under the laws of the State of California, with its principal place of business in the City of San Jose, State of California.  Heritage is a citizen of the State of California.

3.      Plaintiff is informed and believes, and on that basis alleges, that Defendant ZURICH AMERICAN INSURANCE COMPANY ("Zurich") is, and at all times mentioned herein was, a New York corporation, duly organized and existing under and by virtue of the laws of the State of New York, qualified to do business in the State of California, with its principal place of business in the City of Schaumburg, State of Illinois.  Zurich is a citizen of the States of New York and Illinois.  There is complete diversity of citizenship.

4.      Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned in this Complaint Zurich and any other person or entity who may be later named in this action who acted in concert concurrently, separately, vicariously or otherwise, and each of them, were the agents, servants, employees, and/or alter egos of Zurich and each of the other responsible persons or entities whose identities and involvement are presently unknown to Plaintiff, and in doing the things alleged in this Complaint, Plaintiff is informed and believes and thereon alleges that Zurich and those others persons or entities were acting within the scope of their authority as such agent, servant, employee, joint venture and/or alter ego, and with the permission and consent of each other.

## JURISDICTION AND VENUE

5.      This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1) as: (i) there is complete diversity of citizenship between Heritage and Zurich; and, (ii) the amount in controversy exceeds $75,000.

6.      These claims for relief arise under the Court's jurisdiction to hear, entertain and finally decide all matters and claims for relief arising under and pursuant to the Court's diversity

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

H4753.0030 BN 48685531v3

COMPLAINT

jurisdiction under 28 U.S.C. § 1332(a) because all claims for relief arise out of the same case or controversy as existing between Heritage and Zurich.

7.     Venue is proper in the Northern District of California because a substantial part of the events giving rise to the claims for relief asserted herein occurred in the County of Santa Clara, California, including Heritage's procurement of the subject insurance policy and the losses for which Heritage seeks coverage pursuant to the terms of the subject insurance policy.

### GENERAL ALLEGATIONS

8.     This is an insurance coverage dispute arising from Zurich's failure to comply with its coverage obligations in connection with covered claims for which Zurich was provided actual notice.

9.     Heritage is a premier community business bank located in Silicon Valley.

10.     Unbeknownst to Heritage, certain of its accountholders engaged in a Ponzi-like investments scheme involving the sale of "mobile solar generators."   This scheme, later knowns as "DC Solar," involved numerous single-purpose entities and related investment funds that held accounts at Heritage.  Sometime after Heritage terminated those account relationships, federal law enforcement officials raided the DC Solar operations and effectively shut them down.  The DC Solar entities filed for bankruptcy protection, prompting the bankruptcy trustee, a creditor, and certain investor funds to assert claims against parties impacted by the scheme, including Heritage.

11.     As relevant here, Heritage procured primary professional liability coverage called a Bankers Professional Liability or "BPL" Policy and seven (7) layers of excess professional liability coverage under excess BPL policies for the 2018-2019 policy period.  The primary insurance policy, referred to by each of Zurich's excess BPL policies issued to Plaintiff (identified more fully below) specifically describes the Federal primary BPL policy as the "Followed Policy."

12.     Heritage tendered the DC Solar claims to its primary and excess insurers.  In response thereto, Heritage's primary insurer, Federal Insurance Company, a member of the Chubb Group of Insurance Companies ("Federal"), paid its full policy benefits of $5 million to fund the settlement as the primary Bankers Professional Liability Insurance Policy under the "Followed Policy" that it issued to Plaintiff without qualification, deduction, allocation or otherwise

diminishing the full amount of the coverage due and owing to Heritage under the primary Followed Policy, thereby exhausting Heritage's primary coverage.  Unfortunately, these amounts did not fully compensate Heritage for its financial losses stemming from the DC Solar claims.  Heritage was forced to turn to its excess carriers, including Zurich, to satisfy these covered losses.

13.    Despite having been provided notice of the DC Solar claims consistent with the notice provided to Federal, Zurich denied coverage, claiming it did not receive adequate notice. Zurich's erroneous decision to deny coverage is exacerbated by the fact that Federal, the primary carrier for which Zurich provided excess coverage, acknowledged the coverage nature of the claims and paid its policy limits under near identical facts.

14.    As a result of Zurich's breaches of its contractual, legal, statutory, and implied obligations, Heritage's remaining out-of-pocket covered losses exceed $5 million.

**The Zurich Policies**

15.    Commencing on August 1, 2018, Zurich, in consideration of substantial premiums paid, issued a Zurich Excess Select Insurance Policy to Heritage Commerce Corp. as the Parent Organization and its subsidiaries (of which Heritage is a insured subsidiary), bearing Policy No. DOP 5932284-05 (the "First Excess Policy").  The First Excess Policy was issued for the benefit of Heritage, its parent, affiliates, employees and former employees subject to a $5,000,000 aggregate limit of liability that is inclusive of both coverage for the payment of "Loss" represented by the obligation to pay judgments or settlements, and the duty to defend and to pay covered Claim Expenses incurred by Heritage above the amount of the Followed Policy upon the exhaustion of the primary policy limits of $5 million.  A true and correct copy of the First Excess Policy is attached as Exhibit "A" hereto and is incorporated by reference.

16.    In addition to the First Excess Policy, Zurich commencing on the same date, August 1, 2018 also underwrote and issued another excess BPL policy, bearing Policy No. DOP02356620 (the "Sixth Excess Policy") for the benefit of Heritage, its parent, affiliates, employees and former employees, with an aggregate limit of liability in the amount of $5,000,000 also covering the "insureds" for indemnity and related claim expenses in excess of scheduled Underlying Insurance.

Collectively, the First Excess Policy and the Sixth Excess Policy issued by Zurich to Heritage and the other "insureds" thereunder shall be referred to as the "Excess Policies" herein.

17. The First Excess Policy provides first layer excess liability coverage to an underlying primary policy issued by Federal, bearing Policy No. 8212-0722 (referred to in both of Zurich's Excess Policies as the "Followed Policy"). The Followed Policy is among the "Underlying Insurance" and is the "Followed Policy" underlying both of Zurich's Excess Policies. (First Excess Policy, Section I, INSURING CLAUSE [Ex. A, p. A-9].)

18. The First Excess Policy in various places calls for notices and other information to be provided to "the Underwriter" and also refers to Zurich as "Underwriter":

> Insurance is provided by:    Zurich American Insurance Company
> 1299 Zurich Way
> Schaumburg, Illinois 60196
> (The "Underwriter")

(First Excess Policy, Declarations [Ex. A, p. A-7].)

19. The First Excess Policy further confirms it was issued in conformance with the identified Underlying Insurance/Followed Policy (i.e., the Followed Policy):

> The Underwriter issues this policy in reliance upon the statements made in the application, warranty, if permitted, representations or statements made by the **Policyholder** to the Underwriter, in the application to the insurers of the **Underlying Insurance** and any binder of **Underlying Insurance**. All terms in bold below shall have the meaning provided in the Declarations.
>
> *     *     *
>
> Coverage under this policy shall then apply in conformance with and subject to the warranties, if permitted, limitations, conditions, provisions, and other terms of the **Followed Policy**, together with the warranties, if permitted, and limitations of any other **Underlying Insurance**.

(First Excess Policy, Section I, INSURING CLAUSE [Ex. A, p. A-9].)[1]

20. The First Excess Policy provides that Zurich will cover covered claims for which it is provided notice consistent with the Followed Policy:

---

[1] Bolded terms appear in bold text in the First Excess Policy. Other emphasis added.

III. CONDITIONS

A  Reporting and Notice – As a condition precedent to exercising any rights under this policy, the **Policyholder** shall give the Underwriter written notice of any claim or any potential claim under this policy or any **Underlying Insurance** in the same manner required by the terms and conditions of the **Followed Policy**. …

(First Excess Policy [Ex. A, p. A-9].)

21.    The insuring clause of the First Excess Policy expressly provides coverage to Heritage in excess of the Underlying Insurance (i.e., the Federal Primary BPL Policy which also called the  "Followed Policy" by the First Excess Policy):

I.   INSURING CLAUSE - The Underwriter shall provide the **Policyholder** with insurance coverage during the **Policy Period** excess of the **Underlying Insurance**. …  Coverage under this policy shall attach only after:

A. all the Limits of Liability of the **Underlying Insurance** have been exhausted solely as a result of the actual payment of covered loss(es); or

B. the **Policyholder** and/or any other insurer(s), entity, or individual on behalf of the **Policyholder** has paid up to the full limits of liability for such loss, and satisfied any deductible(s) or retention amount(s) of the **Underlying Insurance** on behalf of the insurer(s) of any **Underlying Insurance**, including coverage provided pursuant to a difference in conditions policy.

Coverage under this policy shall then apply in conformance with and subject to the warranties, if permitted, limitations, conditions, provisions, and other terms of the **Followed Policy**, together with the warranties, if permitted, and limitations of any other **Underlying Insurance**.

(First Excess Policy, [Ex. A, p. A-9].)

22.    In addition to the first layer of excess coverage provided by the First Excess Policy, Heritage procured six additional layers of excess coverage for the 2018-2019 term (for a total of seven layers).

23.    Heritage paid all premiums and satisfied all conditions precedent required under the Policy to obligate Zurich to pay contractual benefits for covered losses under the Excess Policies.

24.    As set forth in greater detail below, Heritage renewed the Excess Policies for the 2019-2020 policy period and, in connection with the renewal process during July 2019, Heritage

gave actual notice in writing to Zurich Underwriters of the legal hold demand letter that gave rise to the DC Solar claims, which notice Zurich Underwriters acknowledged in writing at the time.

**The Followed Policy Issued by Federal**

25.     Commencing on or about August 1, 2018, Federal issued a "BPL for Financial Institutions^SM" insurance policy to Heritage Commerce Corp. as the Parent Organization and subsidiaries (of which Heritage is a subsidiary), bearing Policy No. DOP 5932284-05 (the Followed Policy).  The Followed Policy had a policy period of August 1, 2018 to August 1, 2019, with an extended reporting period of 1-year.  The Followed Policy is subject to a $5,000,000 limit of liability and a $500,000 retention.

26.     The Followed Policy obligated Federal to insure Heritage against losses incurred on a covered claim made against Heritage during the policy period:

> The Company shall pay, on behalf of an **Insured**, **Loss** on account of any **Claim** first made against such **Insured** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** committed by an **Insured** or any person for whose acts the **Insured** is legally liable while performing **Professional Services**, including failure to perform **Professional Services**.

27.     The Followed Policy, in relevant part, defines "Professional Services" as:

> those services, including **Loan Servicing**, performed or required to be performed by an **Insured** for or on behalf of a **Customer**:
>
> a.   for a fee, commission or other monetary consideration;
>
> b.   where a fee, commission or other monetary consideration would usually be received by the **Insured** but for business or other reasons is waived by the **Insured**; or
>
> c.   for other remuneration which inures to the benefit of such **Insured**.

28.     Subject to certain expressly-enumerated exceptions, a "Loss" under the Followed Policy encompasses those amounts Heritage becomes legally obligated to pay on account of a covered claim, including defense costs:

> the amount that an **Insured** becomes legally obligated to pay on account of any covered **Claim**, including but not limited to damages (including punitive or exemplary damages if and to the extent that such punitive or exemplary damages are insurable under the law of the jurisdiction roost favorable to the insurability of such damages

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES
H4753.0030 BN 48685531v3

COMPLAINT

provided such jurisdiction has a substantial relationship to the relevant **Insured**, to the Company, or to the **Claim** giving rise to the damages), judgments, settlements, pre-judgment and post-judgment interest and **Defense Costs**.

29.   Under the Followed Policy, "Defense Costs" encompass those costs incurred in defending a claim:

> **Defense Costs** means that part of **Loss** consisting of reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries, fees or benefits of the directors, officers or employees of the **Organization**) incurred in defending any **Claim** and the premium for appeal, attachment or similar bonds.

30.   The Followed Policy defines "Claim" to include:

> a.   a written demand for monetary damages;
>
> b.   a civil proceeding commenced by the service of a complaint or similar pleading; or
>
> b.   an arbitration proceeding commenced by the submission of a statement of claim or similar document,
>
> brought by or on behalf of a **Customer** against an **Insured** for a **Wrongful Ac**t, including any appeal therefrom; or
>
> d.   a criminal proceeding commenced by the service of an indictment, against an **Insured** for a **Wrongful Act**, including any appeal therefrom.

31.   Under the Followed Policy, a claim will be deemed a "Related Claim" if it is "based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events."   Under the Followed Policy, a "Wrongful Act" is "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted, before or during the **Policy Period** by any **Insured** or any person for whose acts the **Insured** is legally liable."

32.   Notably, all losses arising out of the same "Wrongful Act" or "Related Claims" are deemed to be one "Loss" under the Followed Policy (and by extension, Zurich's Excess Policies):

> All **Loss** arising out of the same **Wrongful Act** and all **Related Claims** of the **Insured** shall be deemed one **Loss**, and such **Loss** shall be deemed to have originated in the earliest **Policy Period** in

which a **Claim** is first made against the **Insured** alleging such **Wrongful Act** or **Related Claims**.

33. An "Insured" under the Followed Policy, and under both Zurich Excess Polices, includes Heritage as a subsidiary of the named Parent Organization, Heritage Commerce Corp.

**The "DC Solar" Investment Scheme**

34. On information and belief, the DC Solar enterprise was operated as a Ponzi-like scheme orchestrated by husband and wife Jeffrey and Paulette Carpoff through various "DC Solar" companies that they formed and controlled. In or around 2011, the Carpoffs began selling investment contracts through their various companies, which offered to sell "mobile solar generators" the Carpoffs represented would qualify for certain tax benefits available to alternative energy related products. By December 2018, DC Solar had reportedly raised around $910 million from purchasers who were induced to make such investments by the Carpoffs' misrepresentations.

35. The SEC later determined, as that government agency alleged in a civil enforcement action, that the vast majority of investor funds were not being used to manufacture or maintain the mobile solar generators, but rather were being pilfered for the personal gain of the Carpoffs.

36. Beginning in or around 2015, the Carpoffs and certain DC Solar entities began maintaining deposit accounts with Heritage. In 2017, Heritage began noticing significant increases in the DC Solar accounts and in late August of 2017, Heritage issued "account closure" letters to the holders of the DC Solar accounts. All depository accounts held by the DC Solar entities exited Heritage by October 2, 2017.

37. On or about December 18, 2018, more than 14-months after the DC Solar Heritage deposit accounts were closed, the FBI executed various search warrants on the Carpoff's home and offices, and froze various DC Solar bank accounts located with other banking institutions.

38. By February 2019, the DC Solar entities had commenced Chapter 11 bankruptcy proceedings, which were later converted to Chapter 7 (bankruptcy action). Christina Lovato was appointed as Chapter 7 Trustee in the bankruptcy action of those Debtors' non-real estate assets. Among the creditors in the bankruptcy action was Solarmore Management Systems, Inc. ("Solarmore").

39.     The U.S. Government later alleged in criminal and civil actions that these schemes were perpetrated by the Carpoffs and others.  Notably, Heritage was not alleged to have participated in the scheme and none of the charging authorities made any negative allegations regarding Heritage's conduct in connection with the bank accounts held by the DC Solar entities.  Heritage was determined to be an "innocent" lender and permitted to collect on secured loans.

**Heritage Notifies Zurich of the DC Solar Claims**

40.     On or about July 1, 2019, Solarmore's bankruptcy counsel sent Heritage a "legal hold demand" letter to preserve records concerning DC Solar accounts.

41.     In response, Heritage's counsel provided notice of this demand to Federal in a letter dated July 24, 2019.  Additionally, Heritage's brokers notified all primary and excess carriers (including Zurich) of the "legal hold demand" letter and included a copy of Heritage's counsel's July 24, 2019 letter.

42.     All primary and excess carriers, including Zurich and Federal, acknowledged receipt of this notice in writing prior to the end of July 2019.

43.     On or about August 5, 2019, Federal advised that Heritage's notice constituted "valid notice" of circumstances that may result in a later claim.

44.     Zurich likewise issued renewal policies to Heritage upon receiving and considering the legal hold demand that was provided in writing to Zurich by Heritage's brokers before the end of the 2018-2019 policy period.  Zurich's Senior Underwriter Joseph DiLallo corresponded with the brokers acknowledging receipt from Heritage of the notice of Solarmore "legal hold demand" letter, and stating in writing before the end of July 2019 that the Zurich excess policies would be renewed on the same terms effective August 1, 2019 if Federal was reissuing the Followed Policy at the primary level.  Federal renewed the Followed Policy.  Zurich also renewed its policies.

45.     On or about December 17, 2019, Solarmore filed a lawsuit (the "Solarmore Action") against various parties alleging some kind of involvement with the DC Solar saga.  The Solarmore Action was soon after its filing stayed by order of the District Court, the action was not served and held in abeyance pending indictments of certain Carpoff associates, after which time Solarmore represented that it intended to file an amended complaint.   More than eleven (11) months went

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

H4753.0030 BN 48685531v3

by, during which there were a number of closures of federal government offices, and limited access to the courts owing standing orders relating to the COVID-19 pandemic. A series of orders were issued by the District Court in the Solarmore Action from approximately March 2020 through December 2020, continuing to hold the prosecution of that case in abeyance, staying the time for Solarmore to "amend" and serve that action on any of the more than 40 defendants named in the Solarmore Action; including Heritage and its former employee Diana Kershaw.

46.     Heritage kept Federal, as its primary carrier, informed of developments, and Federal stated in writing on a number of occasions that the primary BPL insurer continued to view the Solarmore Action as merely a "potential" claim, and not then as an active "claim."

47.     Just over one year after the Solarmore Action was filed, on December 18, 2020, Solarmore filed its amended complaint alleging that a Heritage employee aided and abetted and/or cooperated with the Carpoffs to conceal relevant information from Solarmore about its bank accounts at Heritage.  The summons and amended complaint in the Solarmore Action were formally served on Heritage in or around the last week of December 2020.

48.     At or around that same time during mid-to-late December 2020, approximately 29 investor funds, known as the Solar Eclipse Investment Funds (or "SEIFs") also filed a lawsuit in the California Superior Court for Solano County (hereafter the "SEIFs Action") against Heritage alleging that Heritage, among others, facilitated the Carpoffs' scheme by allowing the Carpoffs to setup bank accounts and transfer substantial sums, ostensibly in contravention of those plaintiffs' operating agreements.

49.     Also around that time, during December 2020, Lovato as the Chapter 7 Trustee in the DC Solar bankruptcy action notified Heritage that she intended to pursue either adversary claims in bankruptcy, or possibly standalone actions, against financial institutions including Heritage, that had dealings with the DC Solar debtor entities in which proceedings she would be seeking to recover investor losses and other relief.  In lieu of proceeding with those threatened actions or proceedings against Heritage, the Trustee and Heritage entered into a Tolling Agreement in order explore a mediated resolution of her allegations that had yet to be developed with specificity at the time the Trustee was proposing other options, including litigation.

H4753.0030 BN 48685531v3

50.     In late January 2021, Federal determined that the notices received from Heritage regarding the three DC Solar claims beginning in July 2019 were all "Related Claims" covered during the 2018-2019 policy term under the Followed Policy.  Zurich and all other excess insurers were notified in writing of Federal's coverage determinations under the Followed Policy.

**Federal Honors Its Coverage Obligations; Zurich Does Not Agree to Fund the Negotiated Settlement with the Trustee After Participating in Those Negotiations**

51.     With the participation of Federal and Zurich, Heritage mediated with the Chapter 7 Trustee and ultimately reached a settlement of the adversary claims against Heritage for a total sum of $9 million.

52.     In connection with that negotiated resolution, Federal exhausted its primary policy limits of $5 million, which indemnity limits were applied towards the Trustee Settlement. Conversely, Zurich declined to pay any indemnity sum from its First Excess Policy, including the next $4 million necessary to fully fund the settlement as well as defense fees and costs incurred by Heritage in the defense of these DC Solar claims. Heritage was therefore required to fund the remainder of the settlement itself without the participation of the coverage purchased from Zurich under the First Excess Policy.

53.     By correspondence dated March 18, 2021, counsel for Zurich notified Heritage that Zurich was denying coverage under the First Excess Policy and its Sixth Excess Policy on the stated basis that Zurich had not received any actual notice of the DC Solar claims until February 2021.

54.     By letter dated March 30, 2021, counsel for Heritage reminded Zurich of the specific July 2019 correspondence between Heritage's brokers and Zurich Underwriters in which Heritage notified Zurich of the Solarmore legal hold demand in writing, which had been fully disclosed to Zurich Underwriters in connection with its renewal application and was acknowledged by Zurich Underwriters in writing prior to the renewal of the Excess Policies at the same level for 2019-2020.

55.     The factual premise of Zurich's March 18, 2021 coverage "denial" for the First Excess Policy and Sixth Excess Policy was false. Zurich acknowledged receiving actual notice of Heritage's written disclosures, including the Solarmore demand, in 2019.  In fact, Zurich's senior underwriter corresponded with Heritage's brokers at that time during July 2019 confirming that

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

H4753.0030 BN 48685531v3

COMPLAINT

Zurich Underwriters received the same notice provided to Federal the Solarmore "legal hold demand" that Zurich, upon acknowledging "the claim," would continue to follow the lead of Federal "if there are no changes being made on the primary[.]" Thereafter, Federal re-issued and renewed the primary Followed Policy. Based upon the renewal application, Zurich re-issued and renewed both of the Zurich Excess Policies for the 2019-2020 term in the same positions those primary and excess insurers had occupied in Heritage's BPL insurance portfolio when the Solarmore "demand" was received and transmitted in writing to those insurers in July 2019.

56.     In September 2021, the United States Bankruptcy Court for the District of Nevada in Reno, Nevada issued its order approving Chapter 7 Trustee Christina Lovato's motions under Bankruptcy Rule 9019 approving the settlement and compromise (the "Trustee Settlement").

57.     Nevertheless, Zurich continued to deny coverage for the DC Solar claims. Despite previously acknowledging actual receipt of the Solarmore demand, Zurich contended the notice was not provided in the precise manner required under the Excess Policies by delivering the notice to a "Post Office Box." According to Zurich, it was irrelevant that its underwriters actually saw, reviewed, and acted upon the Solarmore demand and renewed excess coverage on the same terms precisely the manner contemplated by its INSURING CLAUSE for potential claims ("The Underwriter issues this policy in reliance upon the statements made in the application"); rather, Zurich sought to impose a hyper-technical and illusory interpretation of its Excess Policies' notice provisions in a manner inconsistent with both the contract terms when reasonably read together as a whole as well as applicable California law governing notice of claims and potential claims.

58.     In denying coverage, Zurich's coverage counsel cited the text of the First Excess Policy but sought to alter its meaning through the creative use of brackets, effectively attempting to disqualify the Zurich underwriter (the person) who received actual notice of the Solarmore demand as an appropriate "underwriter" of Zurich for purposes of providing notice of a claim. According to the subsequent iteration of Zurich's coverage "denial" the Zurich "Underwriter" can only be deemed to be its Claims Department. The language of the First Excess Policy, quoted above unaltered, makes clear that Heritage's notice was timely and appropriately satisfied any reporting

condition. Regardless, Zurich's underwriter acknowledged actual receipt of the Solarmore demand, further undermining Zurich's contention that it did not receive timely notice of the DC Solar claims.

59.     Heritage subsequently engaged in an extensive efforts to obtain the benefits to which it is entitled under the Policy, but Zurich breached its contractual obligations under the First and Sixth Excess Policies and continues to breach its contractual, common law and statutory obligations, including the recognized duty of good faith and fair dealing under California law arising out of that contractual relationship, in that Zurich has unreasonably failed and refused and continues to fail and refuse to honor its coverage obligations to Heritage and has in addition to the covered contract payments that are due and owing by Zurich to Heritage with legal interest thereon, has proximately and legally caused Heritage to sustain attorneys' fees, court costs, tort damages, and other proximately caused financial losses and injury all in an amount according to proof at the time of trial.  Accordingly, Heritage brings the instant action.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

60.     Plaintiff re-alleges and incorporates by reference the above and below allegations as if fully set forth herein.

61.     In consideration of significant premiums paid, Zurich issued an excess insurance policy to Heritage bearing Policy No. DOP 5932284-05 with a policy period of August 1, 2018 to August 1, 2019 (the First Excess Policy).

62.     Under the First Excess Policy, Zurich is obligated to defend and pay on behalf of Heritage all defense fees, costs, and liabilities incurred in the DC Solar claims upon exhaustion of the Followed Policy limits.

63.     The DC Solar claims involve allegations covered by the First Excess Policy, as evidenced by Federal providing coverage and exhausting its limits under the underlying, Followed Policy without deduction, allocation, exclusion or diminishment in any amount or degree of the full and total its $5 million insurance obligations owing to Heritage under the Followed Policy.

64.     Additionally, under established California law, an insurer's duty to defend a claim is broader than its duty to indemnify and exists whenever the underlying claim is potentially

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

H4753.0030 BN 48685531v3

covered by the insurance contract.  (*Montrose Chem. Corp. of California v. Superior Court*, 6 Cal.4th 287, 295-300 (1993).)  "To prevail, the insured must prove the existence of a potential for coverage, while the insurer must establish the absence of any such potential." (*Montrose*, 6 Cal.4th at 300 [emphasis in original].)

65.     Zurich repeatedly denied its obligations to defend and indemnify Heritage for the DC Solar claims under the First Excess Policy, and has further denied that any coverage would be due and owing under the Sixth Excess Policy should covered losses and expenses exceed the layers of BPL coverage underlying that policy.  As a result, Heritage was forced to personally retain and pay for defense counsel and personally fund settlement amounts incurred over and above the Followed Policy limits and retention, despite reasonably expecting Zurich would provide this benefit in exchange for premiums paid.  (See, e.g., *Montrose*, 6 Cal.4th at 295-96 ["The insured's desire to secure the right to call on the insurer's superior resources for the defense of third party claims is, in all likelihood, typically as significant a motive for the purchase of insurance as is the wish to obtain indemnity for possible liability"].)

66.     To defend the DC Solar claims, Heritage incurred financial losses for alleged liabilities as well as defense fees and costs that should have been paid by Zurich consistent with its obligation to defend claims potentially within the scope of coverage of the First Excess Policy and to indemnify claims within the scope of coverage of each of the First Excess Policy upon exhaustion of the Followed Policy issued by Federal. With respect to coverage obligations under the Sixth Excess Policy, upon the exhaustion of other Underlying Insurance up to that layer.

67.      Prior to the exhaustion of the Federal Followed Policy, and in breach of its duties under both Excess Policies, Zurich has denied coverage for any and all of the DC Solar claims. Following exhaustion of the Followed Policy and funding of the Trustee Settlement by solely Federal and Heritage, Zurich unequivocally reasserted and unqualifiedly ratified its previous "no coverage" position under both Excess Policies, stating in writing that no coverage would be provided to Heritage under the First Excess Policy and the Sixth Excess Policy.

68.     Zurich has repudiated and breached its contractual obligations under the First Excess Policy to defend and indemnify Heritage for the DC Solar claims by failing to make any payments

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

H4753.0030 BN 48645531v3

COMPLAINT

toward Heritage's substantial unreimbursed settlement and defense fees and costs after the exhaustion of the Followed Policy not later than October 2021.

69.     Zurich's refusal to provide coverage under both Excess Policies denies Heritage the benefits for which it contracted under those policies.

70.     As a direct and proximate result of Zurich's breaches of the Excess Policies, Heritage has suffered damages, which Heritage has incurred and will continue to incur, plus interest thereon at the highest legal rate allowed under California law, the exact amount of which has yet to be ascertained but in no event less than the full amount of the First Excess Policy limit of $5 million which was due and payable from and after October 26, 2021 when the Trustee's settlement was fully funded without the participation required under Zurich's First Excess Policy

## SECOND CLAIM FOR RELIEF

### (Breach of Implied Covenant of Good Faith and

### Fair Dealing (Bad Faith))

71.     Plaintiff re-alleges and incorporates by reference the above and below allegations as if fully set forth herein.

72.     In consideration of significant premiums paid, Zurich issued its First Excess Policy to Heritage bearing Policy No. DOP 5932284-05 with a policy period of August 1, 2018 to August 1, 2019 (the First Excess Policy).

73.     Under the First Excess Policy, Zurich was and currently is obligated to defend and pay on behalf of Heritage all defense fees, costs, and liabilities incurred in the DC Solar claims upon exhaustion of Federal's Followed Policy limits. The Followed Policy was exhausted not later than October 26, 2021 and thereafter Zurich has failed and refused, and continues to fail and refuse, to honor any of its excess coverage obligations under the First Excess Policy or any other policy of insurance issued by Zurich with respect to the DC Solar claims.

74.     The DC Solar claims involve allegations covered by the Excess Policies issued by Zurich, as evidenced by Federal providing full coverage and exhausting the full amount of its $5 million primary policy limits under the Followed Policy in payment of the Trustee Settlement.

75.     Zurich has breached their duties of good faith and fair dealing owed to Plaintiff under the Excess Policies by, *inter alia*:

a.      Unreasonably failing to defend and indemnify Heritage for losses incurred in connection with the DC Solar claims, despite repeated demands, at a time when Zurich knew Heritage was entitled to such coverage under the terms of the First Excess Policy and California insurance jurisprudence;

b.      Engaging in unreasonable interpretations of the Excess Policies' provisions and analogous California jurisprudence to avoid its coverage obligations;

c.      Failing to reasonably and thoroughly investigate all bases for coverage under the Excess Policies including, *inter alia*, by unreasonably interpreting the Excess Policies' notice provision despite receiving actual notice, and acknowledging actual notice in writing, of the Solarmore demand;

d.      Expressly misrepresenting to Heritage pertinent policy terms and provisions in violation of California Insurance Code section 790.03(h)(1) by, *inter alia*, omitting and altering critical policy language regarding notice of claims;

e.      Failing to communicate with Heritage in good faith by omitting and altering pertinent policy terms and provisions in correspondence with Heritage;

f.      Applying unreasonable interpretations to the terms of the Excess Policies;

g.      Failing to acknowledge and act reasonably promptly upon communications with respect to Heritage's claims arising under the Policy;

h.      Failing to affirm coverage of claims within a reasonable time after proof of loss requirements have been completed and submitted by Heritage;

i.      On information and belief, failing to adopt and implement reasonable standards for the prompt investigation and processing of claims such as Heritage's claim;

j.      Engaging in inadequate and tardy investigations of Heritage's claims;

k.      Failing to promptly process and pay Heritage's claims; and

l.      Placing Zurich's own interests in minimizing its coverage obligations under the Excess Policies ahead of the interests of their insured, Heritage.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

H4753.0030 BN 48685531v3

76.     In declining to fulfill its coverage obligations to Heritage under the First Excess Policy, and in denying any ongoing duties or obligations to Heritage under the Sixth Excess Policy, Zurich has acted unreasonably, in bad faith and with the knowledge that there was no reasonable basis for its conduct.

77.     As a direct and proximate result of the aforementioned wrongful conduct of Zurich, Heritage has presently sustained damages, losses and out-of-pocket expenses, including, but not limited to, attorneys' fees attributable to its efforts to obtain the coverage provided under the First Excess Policy and California law.  It may in the future continue to sustain damages, losses and out-of-pocket expenses, including by not limited to, attorneys' fees attributable to its efforts to obtain the coverage provided under the Sixth Excess Policy and California law, which excess coverage was also wrongfully and, in bad faith, denied by Zurich.

78.     Zurich has tortiously withheld from Heritage benefits due under the First Excess Policy, and declared that it owes "no coverage" under the Sixth Excess Policy regardless of the outcome of the remaining DC Solar claims, and consistent with the holding of *Brandt v. Superior Court*, 37 Cal.3d 813 (1985), Heritage has been forced to engage the services of legal counsel, Buchalter, a Professional Corporation, as well as financial consultants and insurance experts whose services and related expenses have been reasonably necessary to seek recovery of the unpaid contractual benefits that are due and owing by Zurich; hence, Heritage is entitled to recoup its reasonable attorneys' fees and related costs and expenses, including but not limited to expert expenses, that were reasonably incurred and expended by the policyholder in order to recover such benefits withheld unreasonably and in bad faith by Zurich under one or both of its Excess Policies.

79.     Zurich's conduct as described herein was committed with a conscious disregard of Heritage's rights and with the intent to vex, injure, or annoy Heritage, that constitutes oppression, fraud, or malice under California Civil Code section 3294 that warrants an award punitive or exemplary damages in an amount appropriate to punish and set an example of Zurich.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

H4753.0030 BN 48685531v3

**THIRD CLAIM FOR RELIEF**

**(Specific Performance)**

80.     Plaintiff re-alleges and incorporates by reference the above and below allegations as if fully set forth herein.

81.     Heritage is insured by Zurich under a specifically enforceable contract sufficiently certain in its terms, i.e., the First Excess Policy.

82.     At all pertinent times, the required premiums were paid with respect to the First Excess Policy, and said policy was in full force and effect. Thus, Zurich received adequate consideration for the First Excess Policy.

83.     In addition to the First Excess Policy, Zurich commencing on the same date, August 1, 2018 also underwrote and issued another excess BPL policy, bearing Policy No. DOP02356620 (the Sixth Excess Policy) for the benefit of Heritage, its parent, affiliates, employees and former employees, with an aggregate limit of liability in the amount of $5,000,000 also covering the "insureds" for indemnity and related claim expenses in excess of the first $35 million in Underlying Insurance.

84.     At all pertinent times, the required premiums were paid with respect to the Sixth Excess Policy, and said policy was in full force and effect. Thus, Zurich received adequate consideration for the Sixth Excess Policy.

85.     The provisions of the Excess Policies, particularly the First Excess Policy, requiring Zurich to provide an immediate defense and indemnification to Heritage are fair, just and reasonable.  Heritage has a reasonable expectation to the prompt and total reimbursement of all such liability coverage due and payable by Zurich as those obligations become due because a policyholder in the position of Heritage (having paid substantial seven-figures to Zurich in the years preceding the 2018-2019 Excess Policies and for that specific policy term) has a reasonable expectation of receiving the full amount of the protection due from such insurance coverage with regard to the only claims for which coverage was ever requested from Zurich during the entirety of the policyholder-insurer relationship up until the time those demands were made.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

H4753.0030 BN 48685531v3

COMPLAINT

86.     Heritage repeatedly demanded Zurich reimburse defense and indemnification losses incurred in connection with the DC Solar claims consistent with the provisions of the Policy. Zurich has refused to do so, thereby necessitating Heritage retain defense counsel at its own expense to protect its interests and coverage counsel to seek the full amount of the benefits due and owing by Zurich under each of the Excess Policies.

87.     Zurich is presently in breach of its contractual obligations to Heritage under the First Excess Policy by failing to compensate Heritage for defense and indemnity losses incurred following the exhaustion of the Federal Followed Policy limits in the full amount of the policy limits of $5 million that are presently due and owing by Zurich to Heritage under said First Excess Policy.

88.     Zurich's failure to satisfy its duties and coverage obligations puts in jeopardy Heritage's entitlement to subsequent layers of excess coverage needed to cover all losses and related legal expenses incurred in the DC Solar claims.  If Zurich does not provide Heritage with immediate reimbursement due under the First Excess Policy, Heritage will be irreparably harmed. Therefore, Heritage has no adequate remedy at law in that it will be deprived of the benefits that Zurich  promised to provide by accepting Heritage's premiums under the First Excess Policy, and to the extent that excess insurance becomes due and owing for the DC Solar claims.

89.     The unreimbursed losses costs incurred by Heritage exceed $5 million, exclusive of interest accruing thereon.  As a result of Zurich's continuing refusal to reimburse these substantial amounts, Heritage has been forced to independently and exclusively shoulder these financial liabilities and losses that by virtue of its enforceable contractual obligations should have been borne by Zurich.

## FOURTH CLAIM FOR RELIEF

### (Declaratory Relief)

90.     Plaintiff re-alleges and incorporates by reference the above and below allegations as if fully set forth herein.

91.     By virtue of Zurich's repeated denials of any coverage obligations to Heritage under each of the Excess Policies issued by Zurich, an actual and justifiable controversy exists between

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

H4753.0030 BN 48685531v3

COMPLAINT

Heritage, on the one hand, and Zurich, on the other hand, regarding Zurich's duty to provide a defense and indemnification to Heritage for losses and legal expenses incurred in connection with the DC Solar claims in excess of the Federal Followed Policy.

92.     In consideration of significant premiums paid, Zurich issued an excess insurance policy to Heritage bearing Policy No. DOP 5932284-05 with a policy period of August 1, 2018 to August 1, 2019 (the First Excess Policy).

93.     In addition to the First Excess Policy, Zurich commencing on the same date, August 1, 2018 also underwrote and issued another excess BPL policy, bearing Policy No. DOP02356620 (the Sixth Excess Policy) for the benefit of Heritage, its parent, affiliates, employees and former employees, with an aggregate limit of liability in the amount of $5,000,000 also covering the "insureds" for indemnity and related claim expenses in excess of Underlying Insurance, including $10 million in Underlying Insurance that is provided by the Followed Policy and the First Excess Policy.

94.     Under the Excess Policies, Zurich is obligated to defend and pay on behalf of Heritage all defense fees, costs, and liabilities incurred in the DC Solar claims upon exhaustion of the Federal Followed Policy limits. The Followed Policy limits of $5 million were fully exhausted not later than October 26, 2021.  Zurich upon being notified of such exhaustion of the Followed Policy, renewed its coverage denial under both Excess Policies repudiating any and all duties and obligations currently due and owing to Heritage thereunder.

95.     The DC Solar claims involve allegations and claims that covered by the Excess Policies, as evidenced by Federal providing full coverage and exhausting its full limits under the Followed Policy without allocation, reduction or discount.

96.     Zurich has repudiated and breached its duties and obligations currently due and owing to Heritage under each of said Excess Policies by repudiating and declaring that "no coverage" will be provided for any of the DC Solar claims now or in the future under either the First Excess Policy or the Sixth Excess Policy.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

H4753.0030 BN 48685531v3

COMPLAINT

97.     Heritage regularly advised Zurich that failure to coverage for the DC Solar claims for losses and expenses incurred in excess of the Followed Policy limits was contrary to its obligations under the First Excess Policy and California law.

98.     In addition to the First Excess Policy, Heritage regularly advised Zurich that its unequivocal repudiation and unqualified denial of any coverage obligations for the DC Solar claims for losses and expenses incurred by Heritage that may hereafter become due under the Sixth Excess Policy was contrary to its obligations under the Sixth Excess Policy and California law.

99.     Heritage respectfully requests a judicial determination and declaration that Zurich was and is currently obligated to compensate Heritage for losses sustained, including defense costs incurred, in connection with the DC Solar claims under the First Excess Policy.  In addition, Heritage respectfully requests a judicial determination and declaration that Zurich by repudiating and denying that it owes any duties and obligations under the Sixth Excess Policy is in breach or anticipatory breach of said excess policy and California law.

100.    A judicial declaration of Zurich's duties under the Excess Policies is necessary and appropriate at this time because Heritage has substantial unreimbursed costs and expenses incurred in defense and settlement of certain components of the DC Solar claims, and ongoing legal expenses and contingencies with respect to insurance available for the remainder of the DC Solar claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Zurich as follows:

1.    For actual damages according to proof;

2.    For special damages according to proof;

3.    For consequential damages according to proof;

4.    For judicial declarations that:

    a.    Heritage's interpretation of the First Excess Policy and the Sixth Excess Policy is correct; and

    b.    Zurich is presently obligated to compensate Heritage for the full value of its covered losses, up to the First Excess Policy limits, for all losses sustained and tendered in excess of the Followed Policy limits;

5.    For specific performance of Zurich's coverage obligations owed to Heritage, including the immediate payment of unreimbursed losses incurred in the defense and settlement of components of the DC Solar claims;

6.    For punitive and exemplary damages in an amount sufficient to punish Zurich for its wrongful conduct;

7.    For interest at the maximum legally permissible rate from the date of the initial breaches;

8.    For Heritage's reasonable attorneys' fees as allowed by law;

9.    For costs of suit incurred herein; and

10.   For such other and further relief as the Court deems just and proper.

DATED:  December 30, 2021          BUCHALTER
                                   A Professional Corporation


                          By:   */s/HARRY W.R. CHAMBERLAIN II*
                                   Harry W.R. Chamberlain II
                                   Cecilia Miller
                                   Ryan Caplan
                                   Attorneys for Plaintiff
                                   HERITAGE BANK OF COMMERCE


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this matter as provided by Federal Rule of Civil Procedure, Rule 38 to the fullest extent allowed by law.


DATED:  December 30, 2021          BUCHALTER
                                   A Professional Corporation


                          By:   */s/HARRY W.R. CHAMBERLAIN II*
                                   Harry W.R. Chamberlain II
                                   Cecilia Miller
                                   Ryan Caplan
                                   Attorneys for Plaintiff
                                   HERITAGE BANK OF COMMERCE

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

23

H4753.0030 BN 48685531v3

COMPLAINT